**Audrey P. DYJAK, Plaintiff**

v.

**BAYSTATE HEALTH SYSTEMS, INC., Defendant.**

Civil Action No. 12–30027–KPN.

United States District Court, D. Massachusetts.

April 17, 2013.

Thomas A. Kenefick, III, Law Office of Thomas A. Kenefick III, Springfield, MA, for Plaintiff.

Amelia J. Holstrom, Marylou Fabbo, Skoler, Abbott & Presser, P.C., Springfield, MA, for Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 18)*

NEIMAN, United States Magistrate Judge.

Audrey P. Dyjak ("Plaintiff") brought this age discrimination action in state court asserting claims against Baystate Health Systems, Inc. ("Defendant") pursuant to both MASS. GEN. LAWS ch. 151 B (Count I) and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 (Count II). On February 9, 2012, pursuant to 28 U.S.C. § 1441, Defendant removed the action to this court because it raised a federal question under 28 U.S.C. § 1331. Plaintiff, who was fifty-two years old at the time, asserts that Defendant's proffered reason for terminating her employment was pretextual and that its actual motivation was unlawful age discrimination.

Pursuant to 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties have consented to the jurisdiction of this court. Defendant presently seeks summary judgment on both of Plaintiff's claims. For the reasons that follow, the court will grant Defendant's motion.

### I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### II. BACKGROUND

The parties do not dispute the following facts, which are construed in a light most favorable to Plaintiff. Plaintiff began working for Baystate Medical Center as a Registered Nurse on March 1, 1991. (Defendant's Rule 56 Statement of Undisputed Fact ("Def's SOF") ¶ 1.) She did not have an employment contract with Baystate but, rather, was an at-will employee. (*Id.* ¶ 2; Exhibit 1 (attached to Def's SOF) at 148.) From 2002 until her termination, Plaintiff worked thirty-two hours per week on a part-time basis in Interventional Radiation and on a per diem basis in the Recovery Room. (*Id.* ¶ 4.) In the ten years preceding February of 2009, she performed her work duties well and received only positive employment reviews; Plaintiff also received at least fifteen "Baystate Best" commendations for excellent care. (Plaintiff's Concise Statement of Material Facts ("Pl's SOF") ¶ 9.)

On February 2, 2009, Plaintiff, after having slept only four hours the previous night because she was on-call, assisted a Nurse Practitioner, Tracy Martino, who

was inserting a peripheral central line into a patient. (*Id.* ¶ 11–12.) During the procedure, Plaintiff turned the patient's monitor so she could see it. (*Id.* ¶ 13; Def's SOF ¶ 9.) Martino, however, asked Plaintiff to turn the monitor back to its previous position, which Plaintiff did. (Def's SOF ¶ 9.) Plaintiff then returned to the door threshold, pulled down her mask and, because she was feeling nauseous, sighed audibly. (*Id.* ¶ 9; Pl's SOF ¶ 15.) Martino interpreted the sigh as an act of defiance and told Plaintiff to leave the room. (Pl's SOF ¶ 16.) Sometime thereafter, Plaintiff attempted to apologize to Martino, who told Plaintiff that she expected nurses "to be in the room with their lead on and their mask, watching the monitor and to serve [her] as needed." (Def's SOF ¶ 10.) Plaintiff responded by stating that she was not Martino's servant. (*Id.*) After Martino complained to Karl Kamyk, the Assistant Director of Radiology and one of Plaintiff's supervisors, Plaintiff met with Kamyk, another supervisor, Martino, and the Director of Heart and Vascular in Kamyk's office. (*Id.* ¶ 11, 13.) Plaintiff requested that the meeting be postponed until the next day because she was tired, but it was not. (Pl's SOF ¶ 20–21.) After five or ten minutes, Plaintiff unilaterally left the meeting, stating "I am leaving and we will discuss this tomorrow." (Def's SOF ¶ 14.)

On February 19, 2009, Kamyk issued Plaintiff a documented "Verbal Counseling" for lack of professionalism in violation of a Baystate Discipline Policy pertaining to the incident with Martino on February 2, 2009. (*Id.* ¶ 16; Pl's SOF ¶ 24.) The Disciplinary Notice stated that "additional infractions may prompt further disciplinary action up to and including termination from employment." (Def's SOF ¶ 16.) A "Verbal Counseling" does not affect an employee's "good standing," however, and does not become part of an employee's personnel file; rather, it is the first step in Baystate's progressive disciplinary process, which could lead to a written warning if an employee has subsequent conduct issues. (*Id.* ¶ 17; Pl's SOF ¶ 25; Exhibit 3 (attached to Def's SOF) at 23–24.)

After the incident with Martino, Plaintiff believed that her relationship with Kamyk had changed. (Def's SOF ¶ 19.) For example, Plaintiff thought Kamyk wanted to stifle her personality at work. (*Id.* ¶ 31; Pl's SOF ¶ 26.) Kamyk also followed and observed Plaintiff more closely than other employees. (Pl's SOF ¶ 29.) As a result, Plaintiff felt anxious and uncomfortable at work. (*Id.*) In April of 2009, Kamyk gave Plaintiff her performance evaluation. (*Id.* ¶ 30; Def's SOF ¶ 21.) Kamyk rated her overall clinical evaluation as good and issued her a merit raise. (Pl's SOF ¶ 31; Def's SOF ¶ 24.) Kamyk's evaluation, however, also included criticisms of Plaintiff's attitude at work, including that she made inappropriate comments to leadership, sighed loudly, and complained publicly. (Def's SOF ¶ 25; Exhibit 1 (attached to Def's SOF) at 59–61.) In April of 2009, sometime after the evaluation, Kamyk offered Plaintiff a full-time position performing the same duties as her part-time position; Plaintiff did not accept the offer because she was no longer comfortable in the department. (Def's SOF ¶ 32; Pl's SOF ¶ 35.)

On or around June 3, 2009, Plaintiff was accessing a portacath line in a patient when the patient became non-responsive. (Def's SOF ¶ 33.) Plaintiff then called in a Rapid Response Team and, when they did not arrive fast enough, called a Code. (*Id.* ¶ 33 Pl's SOF ¶ 39.) At that time, Michael Favreau, who was Kamyk's direct supervisor, heard, from his office, Plaintiff "screaming" and "creating a lot of chaos." (Def's SOF ¶ 34; Exhibit 2 (attached to Def's SOF) at 22.) After the Code team

arrive, Peter Vassallo, who was the Manager of Radiology, instructed Plaintiff to leave the room. (Def's SOF ¶ 35; Pl's SOF ¶ 39.)

The following day, Plaintiff went to the Friendly's Café, a public restaurant at the hospital, where she saw the partner of the patient for whom the Code was called the previous day. (Pl's SOF ¶ 43–44.) The partner also worked at Baystate as a supervisor in the Emergency Room. (Id.) Plaintiff told the partner that she was the first responding nurse and stated: "May I please ask, without violating HIPAA, how she's doing?" (Exhibit 1 (attached to Def's SOF) at 77.) The patient's mother was also present, and Plaintiff repeated the same question to her. (Id.) The partner told Plaintiff that the patient had a stroke; Plaintiff responded with shock and told them about how she had been asked to leave the room by Vassallo. (Id. at 77–78, 134–35.) Plaintiff shared this information because she "wanted her to know that it's unfortunate that there was some mismanagement going on" and she "wanted her to know that there was an act on [Vassallo's] part that was unprofessional." (Id. at 135, 136). There were not many people in the vicinity during the conversation, and Plaintiff spoke in a low voice. (Pl's SOF ¶ 48.)

On June 8, 2009, the patient's partner made a formal complaint to Vassallo about the conversation with Plaintiff in Friendly's. (Def's SOF ¶ 38.) She thought it was inappropriate for Plaintiff to have spoken about the matter in a public place and within ear-shot of others. (Id.) Moreover, she thought the conversation was extremely inappropriate and a violation of the patient's privacy and HIPAA. (Id.) She also stated that Plaintiff had badmouthed staff, managers, and radiologists and that Plaintiff had been out of line for expressing her comments in front of a person she did not know. (Id.) On June 12, 2009, Vassallo

and Kamyk met with Plaintiff and asked her about the conversation at Friendly's. (Id. ¶ 40.) Plaintiff explained that she had asked to speak with the women without violating HIPAA but admitted that she had discussed the patient's care and the fact that Vassallo had asked her to leave the room. (Id.)

Defendant maintains a Confidentiality Policy, BH–HR–106, which, in applicable parts, provides as follows:

> It is the policy of Baystate Health to safeguard confidential business information and information about the medical care of its patients.... [T]hose who have access to patient and business information will protect the information and limit dissemination to appropriate individuals at appropriate times.... Those associated with Baystate shall not seek access to, use nor disseminate information for which they do not have a need or right to know to perform their direct responsibilities.... Failure to protect confidential information will result in disciplinary action up to and including termination of employment.

(Exhibit 9 (attached to Def's SOF).) In addition, the written policy contains a "Questions and Answers" section, which provides, in part:

> Sometimes, I can't have professional discussions about patients in strict privacy. For example, I may ask a nurse to schedule an x-ray at the nurses' station where many can overhear me. Is this a violation of the patient's privacy? No, provided that you take precautions that you are not overheard such as lowering your voice. If someone overheard you, it would be considered an "incidental disclosure" and not a violation of the privacy rule.
>
> Every so often after work, my friends and I go to unwind at a local bar. Inevitably, things that happen at work come

up. Some of our conversations include information about patients. This makes me uncomfortable. What should I do? Confidentiality is a 24–hour a day responsibility. Our patients, coworkers and others associated with Baystate place their trust in us at all times. We have a legal and ethical responsibility to protect their right to confidentiality, on and off the job. You should remind your friends that these kinds of conversations should not occur.

(*Id.*) Plaintiff understood that she could be terminated for a single violation of this policy, (Def's SOF ¶ 41), but later testified at her deposition that Baystate employees regularly violated the Confidentiality Policy and were not reprimanded because "they weren't reported." (Exhibit 1 (attached to Def's SOF) at 128.) However, Plaintiff could not identify anyone who both violated the policy and was not reprimanded. (*Id.* at 129.) Nadrah McKenzie, a senior human resources consultant at Baystate, testified that she was aware of five or six employees who violated the policy and were terminated. (Exhibit 3 (attached to Def's SOF) at 36–37.) In addition, Favreau testified that, to his knowledge, everyone who was found to have breached patient confidentiality had been terminated. (*Id.* at 35.)

On June 17, 2009, Defendant terminated Plaintiff's employment, citing a violation of BH–HR–106 for inappropriately disclosing medical and business information in Friendly's to the patient's partner and mother. (Def's SOF ¶ 42.) Utilizing Baystate's Dispute Resolution Procedure, Plaintiff filed a grievance regarding her termination. (*Id.* ¶ 51.) In connection therewith, Favreau interviewed Plaintiff and re-interviewed the patient's partner.

(*Id.*) Favreau ultimately decided to uphold the decision. (*Id.*)

Following Plaintiff's termination, Victor Underwood, who held a part-time position on the Nursing Flex Team, undertook some of her responsibilities. (Pl's SOF ¶ 64; Exhibit 11 (attached to Pl's SOF) at 43–44.) Underwood was under 40 years old at the time and was not as qualified as Plaintiff. (Pl's SOF ¶ 65–66.) On September 9, 2009, Kathleen Nichols, who is older than Plaintiff, transferred into the position previously held by Plaintiff. (Def's SOF ¶ 52.) After her termination, Plaintiff timely filed a claim with the Massachusetts Commission Against Discrimination ("MCAD") regarding her termination. (Pl's SOF ¶ 1.)

### III. DISCUSSION

Defendant makes two arguments in support of its motion for summary judgment. First, it argues that Plaintiff failed to exhaust her administrative remedies by naming "Baystate Medical Center" instead of "Baystate Health Systems, Inc." in the MCAD proceedings. Second, Defendant argues that Plaintiff has not provided sufficient evidence demonstrating that she was discriminated against based on her age as claimed in Counts I and II.[1]

### A. *Failure to Exhaust Administrative Remedies*

In support of its first argument, Defendant points to the fact that the MCAD proceedings were brought against "Baystate Medical Center" while the instant suit has been brought against "Baystate Health Systems, Inc." Plaintiff responds by arguing that, through its conduct both during the MCAD proceedings and in the case at bar, Defendant acted as the same

---

1. Plaintiff also asserted a claim for breach of an implied covenant of good faith and fair dealing (Count III) but abandoned this claim at the hearing on Defendant's motion for summary judgment.

entity as "Baystate Medical Center." As such, Plaintiff argues, Defendant itself defended against the MCAD complaint and had notice of Plaintiff's claims, all of which satisfies the purposes of the exhaustion requirement. The court agrees with Plaintiff.

The relevant facts follow. Plaintiff did name "Baystate Medical Center" as the respondent in the MCAD charge, although Defendant before this court is "Baystate Health Systems, Inc.," a separate but related entity. (Pl's SOF ¶ 2.) Nevertheless, throughout the MCAD proceedings, Defendant acted as the real party-in-interest and represented itself as Baystate Medical Center. (*Id.* ¶ 3–5.) For example, Elizabeth Blaney, who signed Respondent's Position Statement submitted in connection with the MCAD proceedings and who was the Senior Employee Relations Consultant, verified that she had "read the foregoing Statement of Position and it is true to my knowledge" and that "*Baystate Health* adopts it as its statement." (*Id.* ¶ 3 (emphasis added).) Defendant also represented itself as the same entity as "Baystate Medical Center" throughout the discovery in this case. (*Id.* ¶ 5.) For example, in response to a request for "all documents Baystate submitted to or received from" the MCAD, it produced the same Position Statement that "Baystate Medical Center" submitted in the MCAD proceedings. (*Id.*) Moreover, in various documents, Defendant identifies itself at different times as "Baystate Medical Center," "Baystate Health Systems, Inc.," and "Baystate Health." (*Id.* ¶ 6.)

■ "The purpose of the [administrative exhaustion] requirement is to provide the party with notice of a potential lawsuit and an opportunity to conciliate." *Butner v. Dep't of State Police,* 60 Mass.App.Ct. 461, 803 N.E.2d 722, 728 n. 14 (2004). "[T]here may," however, "be an exception [to the

requirement] where a plaintiff filed an MCAD complaint against another party and the unnamed party had notice and opportunity to participate in the proceedings." *Id.* Several years before *Butner,* the Massachusetts Appeals Court, in *King v. First,* 46 Mass.App.Ct. 372, 705 N.E.2d 1172 (1999), had examined such an exception with reference to federal charges before the Equal Employment Opportunity Commission:

> The Federal courts have consistently held that there are exceptions to the general rule that a party who is not named as a respondent in an administrative charge before the Equal Employment Opportunity Commission under Title VII of the Civil Rights Act of 1964 ... is not subject to a subsequent civil action.... One of those exceptions is where the named party acted as an agent of the unnamed party and the unnamed party had notice of, and participated in, the conciliation proceedings.... Other considerations include whether the complaining party could ascertain through reasonable efforts the role of the unnamed party in the alleged discriminatory incident; whether the interests of the named party are similar to those of the unnamed party; whether the absence of the unnamed party from the administrative proceedings would result in actual prejudice to the unnamed party; and whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 1173–74 (citations omitted). Although the Appeals Court did not entirely resolve the applicability of the exception to the MCAD context, it assumed that the exception applied but determined, given the facts before it, that the plaintiff could not satisfy the exception even if it were

available. *Id.* at 1174. Here, the court is persuaded that, if given the opportunity, the Supreme Judicial Court, with reference to the MCAD context, would adopt as eminently reasonable the exception regarding unnamed parties discussed in *King. See Chatman v. Gentle Dental Center of Waltham,* 973 F.Supp. 228, 235 (D.Mass.1997) ("[T]he court concludes that, faced with the question, the Massachusetts Supreme Judicial Court would hold that failure to name a party as a respondent in a charge filed with the MCAD does not preclude a later civil action against that party if the conduct of the party was put in issue by the charge and the party had notice of and an opportunity to conciliate the charge.").

▪ Applying the exception described in *King,* Defendant's awareness of and participation in the MCAD proceedings, as Plaintiff argues, demonstrates that the purposes of the exhaustion requirement have been met. *See Butner,* 803 N.E.2d at 728 n. 14. Essentially, "Baystate Medical Center," through its participation, "acted as an agent" of Defendant during the MCAD proceedings. *See King,* 705 N.E.2d at 1173. As to the "[o]ther considerations," it is unclear whether Plaintiff could have ascertained "through reasonable efforts," at the time of the MCAD proceedings, that "Baystate Health Systems, Inc." rather than "Baystate Medical Center" was the entity responsible for Plaintiff's alleged discriminatory treatment; it is undisputed, however, that the interests of the two entities "are similar," if not identical; Plaintiff's failure to name

Defendant in the MCAD proceedings did not result in "actual prejudice" to Defendant; and—as demonstrated by Defendant's conduct during the MCAD proceedings and discovery in the instant litigation, as well as statements made in its employment documents—Defendant "has in some way represented to [Plaintiff] that its relationship with [her] is to be through [Baystate Medical Center]." *See id.* at 1173–74. In short, it would be inequitable for Defendant to rely on Plaintiff's mistake in failing to name the correct party during the MCAD proceedings when the purposes of the exhaustion requirement have in fact been met.[2]

## B. *Age Discrimination Claims*

As its main argument, Defendant asserts that it is entitled to summary judgment on Counts I and II because Plaintiff cannot establish that she was discriminated against on the basis of age. Defendant first argues that Plaintiff cannot establish a *prima facie* case of age discrimination because she cannot prove that she was performing her job at an acceptable level or that she was replaced by a substantially younger employee. Next, Defendant argues that, even if Plaintiff can establish a *prima facie* case, it has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, namely, her violation of the Confidentiality Policy. Finally, Defendant argues that Plaintiff cannot demonstrate that its articulated reason for terminating her was false and that its real reason was age discrimination.

---

**2.** Defendant similarly argues that Plaintiff's failure to name Defendant in the Equal Employment Opportunity Commission proceedings precludes her ADEA claim. However, the First Circuit in *McKinnon v. Kwong Wah Restaurant,* 83 F.3d 498, 505 (1st Cir.1996), explained that, "[a]lthough generally a plaintiff must name a defendant in the proceedings

before the EEOC in order to proceed against the defendant in federal court under Title VII, this charging requirement is subject to exception," adverting to the exception described in *King.* Accordingly, the same analysis regarding Defendant's exhaustion argument for the state law claim applies to the ADEA claim.

Plaintiff responds by arguing that she can establish a *prima facie* case because she was a member of a protected class, qualified for the job, terminated, and replaced by someone who was at least five years younger than she. Plaintiff also argues that Defendant has not proffered a legitimate reason for discharging her since her conduct did not warrant termination and Defendant did not have a clear policy requiring her to be discharged for the Friendly's incident. Last, Plaintiff argues that she has met her burden of showing pretext because Defendant "never had competent evidence to believe [she] had violated" the Confidentiality Policy and because Defendant could have administered a lesser sanction but did not do so despite her years of exemplary service. According to Plaintiff, these circumstances demonstrate sufficient circumstantial evidence of pretext.

■■■ In the absence of direct evidence of discrimination, of which there is none here, both Massachusetts and federal age discrimination claims are governed by the three-step *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Wheelock Coll. v. Massachusetts Com'n Against Discrimination*, 371 Mass. 130, 355 N.E.2d 309, 313–14 (1976). First, a plaintiff must demonstrate a *prima facie* case of age discrimination. To do this under the ADEA, the plaintiff must show (1) she was over forty years old at the time of the adverse action; (2) she was subjected to such an action, such as a termination; (3) she was performing her job at a level that met the defendant's legitimate expectations; and (4) following her termination, she was replaced by someone substantially younger. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 310, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *Melen-*

*dez v. Autogermana, Inc.*, 622 F.3d 46, 50 & n. 5 (1st Cir.2010). Under Massachusetts law, in addition to the ADEA requirements, a plaintiff must demonstrate that she was replaced by someone who was at least five years younger than her. *Knight v. Avon Products, Inc.*, 438 Mass. 413, 780 N.E.2d 1255, 1264–65 (2003). If the plaintiff can satisfy this initial burden, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corps*, 411 U.S. at 802, 93 S.Ct. 1817; *Wheelock College*, 355 N.E.2d at 313–14. If the defendant meets that burden, the burden of production shifts back to the plaintiff to demonstrate that the defendant's articulated reason was pretextual. *Id.* While the burden of production shifts back and forth, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 1. *Plaintiff's Prima Facie Case*

■ Defendant argues that Plaintiff's *prima facie* case fails at the third and fourth prongs. As to the third prong, Defendant asserts that Plaintiff was not performing her job at an acceptable level because she violated Baystate's Confidentiality Policy. The First Circuit has explained, however, that a court may not " 'consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case,' " as Defendant seeks to do here, because doing so "would 'bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.' " *Melendez*, 622 F.3d at 51

(quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003)). Therefore, because Defendant invokes the Confidentiality Policy violation at the third step of the burden-shifting framework, it cannot rely on that purported violation at the first step as well. *See id.; see also Henderson v. Burlington Coat Factory Warehouse of Braintree, Inc.*, 72 Mass.App.Ct. 1105, 2008 WL 2582698, at *4 (Mass.App.Ct. July 1, 2008) (unpublished) (finding that, despite the defendant's argument that the plaintiff was not performing his job at an acceptable level due to his termination for "inappropriate behavior," the plaintiff satisfied the third prong because "prior to the allegation of sexual harassment he was performing his job adequately."). Moreover, the record demonstrates that Plaintiff consistently received positive evaluations and, in fact, was offered a permanent position in April of 2009, approximately two months before the Friendly's incident. In short, the court finds, Plaintiff has satisfied the third prong of her *prima facie* case.

■ As to the fourth prong, Defendant asserts that Plaintiff was not replaced by someone substantially younger because her replacement was not Underwood, the floating and temporary replacement who was under 40 years old at the time, but Nichols, who was older than Plaintiff and who eventually replaced her on a permanent basis. Although there is some support for Defendant's assertion, the court is convinced that, for purposes of her *prima facie* burden, Plaintiff has sufficiently demonstrated that Underwood "replaced" her.

■ " 'A replacement need not be sought from outside the company, of course, nor need he be designated formally as such.' " *Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 333 (1st Cir.1997) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir.1979)). Rath-

er, " '[i]t is enough for [the] plaintiff to show that the employer sought some form of replacement performance, which would demonstrate its continued need for the same services and skills.' " *Id.* at 332–33 (quoting *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 760 (1st Cir.1988)). Here, Plaintiff has presented sufficient evidence that, following her termination, Underwood took over at least some of her responsibilities. *See id.* at 334 (plaintiff can meet burden by showing that her " 'job functions were absorbed by several different employees of defendant' ") (quoting *Kale*, 861 F.2d at 760). Moreover, Nichols was not hired until September 9, 2009, almost three months after Plaintiff's termination. In light of the fact that "[t]he burden of making out a prima facie case is not onerous," *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 844 (1st Cir.1993) (internal quotation marks omitted), the court concludes that a jury could reasonably find that Underwood acted as a "replacement" for Plaintiff from the time of her termination until Nichols was hired. In all, looking at the undisputed facts in the light most favorable to Plaintiff, she has made out a *prima facie* case, thereby shifting to Defendant the burden to articulate a legitimate, nondiscriminatory reason for terminating her.

2. *Defendant's Legitimate, Nondiscriminatory Reason for the Termination*

■ Similar to Plaintiff's burden at the *prima facie* step, Defendant's burden at the second step of the burden-shifting framework is relatively light. *See Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 686 N.E.2d 1303, 1309 (1997); *see also Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 249 (1st Cir. 1997). Here, as described, Defendant points to the Friendly's incident as the

legitimate, nondiscriminatory reason for the termination. According to Defendant, by speaking in a public place about a patient's medical care and mentioning that Vassallo had asked her to leave the room, Plaintiff violated the Confidentiality Policy—or, at least, Defendant reasonably believed so—and was fired for that reason. Plaintiff, in turn, claims that "[t]his is not a legitimate reason for the discharge" because her "conduct did not warrant termination nor did Baystate have a clear policy implementing discharge on that basis."

Contrary to Plaintiff's assertion, Defendant's articulated reason is more than sufficient. Even if Defendant was not required to terminate her for a violation of the Confidentiality Policy, Defendant has sufficiently proffered a legitimate, nondiscriminatory reason for the termination so as to satisfy its burden. *See Matthews*, 686 N.E.2d at 1309 ("'The reasons given for a decision may be unsound or even absurd,' and the action may appear 'arbitrary or unwise,' nonetheless the defendant has fulfilled its obligation.") (quoting *Lewis v. Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 493 N.E.2d 867, 871 (1986)). In short, the court finds, Defendant has provided "enough 'to enable a rational factfinder to conclude that there existed a nondiscriminatory reason'" for Plaintiff's termination. *Melendez*, 622 F.3d at 52 (quoting *Ruiz*, 124 F.3d at 248).

### 3. *Plaintiff's Burden to Demonstrate Pretext*

Plaintiff's argument that she did not violate the Confidentiality Policy and that Defendant was not required to terminate her is more properly analyzed at the third step of the burden-shifting framework. In this regard, the court notes that, although the Massachusetts and federal age discrimination standards are generally analogous, they depart somewhat at

this step. Under federal law, as the First Circuit has explained, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Melendez*, 622 F.3d at 52 (internal quotation marks omitted). Under Massachusetts law, by contrast, a plaintiff need only demonstrate "that one or more of the employer's reasons is false," which showing, "combined with the evidence adduced to meet the employee's burden of proof under the first stage of *McDonnell Douglas*," permits (but does not require) the jury to "infer that the employer is covering up a discriminatory intent, motive or state of mind." *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 751 N.E.2d 360, 368 (2001). Thus, under the "friendlier" *Lipchitz* standard, a mere showing of pretext, "automatically and regardless of circumstances," is sufficient to defeat a motion for summary judgment. *See Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir.2004). Unfortunately for Plaintiff's quest, the court concludes that she not only falls short under the federal standard but the "friendlier" state standard as well.

To be sure, Plaintiff argues that she did not actually violate the Confidentiality Policy because she asked permission before speaking with the patient's partner and mother and spoke in a low voice with few people around. This argument is unpersuasive. In essence, what Plaintiff has failed to do at this stage of the litigation, after all discovery has been completed, is set forth sufficient evidence which at least suggests, let alone demonstrates, that Defendant did not believe that she violated the policy or that it was not the actual reason for her termination. *See Bennett v.*

*Saint–Gobain Corp.,* 453 F.Supp.2d 314, 327 (D.Mass.2006) ("[T]he inquiry is not whether the plaintiff's version of events is true, but whether the decision-maker reasonably believed that the plaintiff had engaged in misconduct.") (citing *Ronda–Perez v. Banco Bilbao Vizcaya Argentaria–P.R.,* 404 F.3d 42, 45 (1st Cir.2005)). What the evidence does show is that Defendant had a policy that arguably—and, in the court's view, almost certainly—prohibited Plaintiff's conduct and clearly provided that employees could be terminated for its violation. Defendant also provided evidence that employees found to have violated the policy in the past were (perhaps every time) terminated. In addition, following Plaintiff's grievance, one of Plaintiff's supervisors, Favreau, reinvestigated the incident and decided to uphold the termination on the same grounds, i.e., a violation of the Confidentiality Policy.

Plaintiff's reliance on the "Questions and Answers" section of the Confidentiality Policy is equally unpersuasive. That section does provide an exception for conversations between Baystate employees which could be overheard by others, but that exception does not apply here because the conversation occurred in a public area—unlike the conversation in the hypothetical example, which occurred in a "nurses' station"—and the patient's partner was not acting in her capacity as an employee at the time but, rather, as a family member. Moreover, the patient's mother, who was not a Baystate employee, was also present. In this regard, the court is unconvinced by Plaintiff's argument that the patient's mother "also was likely knowledgeable about the internal goings-on of Baystate, being related to the supervising nurse of the Emergency Room."

Plaintiff's further argument that Defendant could have imposed a lesser sanction gets her only so far. *See Rathbun v.*

*Autozone, Inc.,* 361 F.3d 62, 74 (1st Cir. 2004) (" '[C]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory decisions.' ") (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991)); *see also Joyal,* 380 F.3d at 19 (" '[I]f the reason given by the employer is the real reason for its action,' it does not matter if 'the employer's action was arbitrary or unwise.' ") (quoting *Wheelock Coll.,* 355 N.E.2d at 315). Granted, Plaintiff argues that she was an excellent employee. But even if true, that fact, on its own, is insufficient to demonstrate pretext. *See, e.g., Liljestrand v. First Allmerica Financial Life Ins. Co.,* 66 Mass.App.Ct. 1112, 2006 WL 1686620, at *5 (Mass.App.Ct. June 20, 2006) (unpublished) ("The plaintiff's reliance on testimony by coworkers that she was a good employee is also misguided, as this testimony does nothing to rebut the specific shortcomings criticized in her performance evaluations."). Moreover, the court cannot ignore a record which demonstrates that Plaintiff had been having conduct issues prior to the Friendly's incident.

Persevering, Plaintiff also avers that she "previously observed [that] Baystate was trying to get rid of its older employees and make way for the new." As Defendant argues, however, this assertion is not entitled to any credit, not only because of its subjectivity but because of the absence of any evidence in support. As was true in *Cordero–Soto v. Island Fin., Inc.,* 418 F.3d 114, 120 (1st Cir.2005), Plaintiff "provides no basis for [her] personal knowledge of the facts supporting [her] statement, as is required for consideration in opposition to a motion for summary judgment" and, that being so, "[a] properly supported motion for summary judgment cannot be defeated by relying upon improbable inferences, conclusory al-

legations, or rank speculation." *See also Polaroid Corp. v. Rollins Environmental Servs., Inc.*, 416 Mass. 684, 624 N.E.2d 959, 967 (1993) ("[B]are assertions and conclusions regarding a company officer's understandings, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment."). In contrast, Defendant points out that all of its employees who held the same position as Plaintiff at the time of her termination, as well as her eventual replacement, were older than she. *See Henry v. United Bank*, 784 F.Supp.2d 68, 75 (D.Mass.2011) (plaintiff's argument "undermined" by fact that defendant did not terminate other employees with same protected status), *aff'd*, 686 F.3d 50 (1st Cir.2012).[3]

Simply put, Plaintiff has not presented any evidence from which a jury could find that the reason provided by Defendant for her termination was false or that its actual motivation was discriminatory age animus.

### IV. CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is ALLOWED.

IT IS SO ORDERED.

---

**3.** Plaintiff also points to the Commonwealth Department of Workforce Development's decision—which held that, because Defendant's Confidentiality Policy was not uniformly enforced, she was entitled to unemployment benefits—as establishing that Defendant's reason for terminating her was pretextual. Defendant responds that the court is prohibited from considering this evidence, citing M.G.L. c. 151A, § 46. Even were the court to consider the evidence, Plaintiff's argument is unavailing because the standard applied by the Commonwealth Department of Workforce Development is different than the standard at issue here. *See Rodio v. R.J. Reynolds Tobacco Co.*, 416 F.Supp.2d 224, 234 (D.Mass.2006) (holding that the plaintiff could not use an unemployment benefits decision to preclude, on *res judicata* grounds, the defendant from arguing that the plaintiff's termination was lawful because the issue in the unemployment decision was "not identical" to the issue before the court).